UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO.  8:19-cv-02013-T-30CPT

SFR SERVICES, LLC a/a/o
KEITH AND PHYLLIS TUMULTY

    Plaintiff,

vs.

ELECTRIC INSURANCE COMPANY,

    Defendant.
_____/

**PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION TO STRIKE/LIMIT
PLAINTIFF'S EXPERT JOSEPH BUTLER'S TESTIMONY**

    Plaintiff, SFR Services, LLC, a/a/o Keith and Phyllis Tumulty ("Plaintiff"), by and through the undersigned counsel and in accordance with Federal Rules of Evidence 702, hereby files this Response and Memorandum of Law in Opposition to Defendant, Electric Insurance Company's ("Defendant") Motion to Strike/Limit Plaintiff's Expert Joseph Butler's Testimony (DE 28) and in support thereof states as follows:

    **I.   INTRODUCTION AND STATEMENT OF FACTS**.

    Plaintiff has brought this action against Defendant for breach of contract as a result of Defendant's failure to perform its contractual obligations under a certain insurance policy and return the damaged property to its pre-loss condition. Keith and Phyllis Tumulty (collectively, the "Insureds") were issued a policy of insurance, identified by policy number 6173052H1 (the "Policy") authored by Defendant to provide insurance coverage for the Insured's property located at 1855 Silver Palm Road, North Port, FL 34288 (the "Property"). On or about September 10,

1

2017, while the Policy was in full force and effect, the Insureds' property was significantly damaged by Hurricane Irma (the "Loss"). On or about January 22, 2019, the Insureds executed an Assignment of Insurance Benefits ("AOB") in favor of Plaintiff, a fully licensed construction company in the State of Florida.

Following the execution of the AOB, Plaintiff provided services agreed upon which included a full inspection and evaluation of the Loss, collection of photographic evidence and supporting documentation in connection with the Loss and oversight of the submission of the subject insurance claim. In addition, Defendant was provided an Invoice detailing Plaintiff's estimated repair and/or replacement cost to repair the property to its pre-loss condition. Plaintiff contracted ButlerMatrix, LLC. (hereinafter "Butler"), an engineering firm with over thirty (30) years of progressive engineering and construction experience, to create a report evaluating the damage suffered by the property through a review of photographic evidence.

Among its findings, Butler concluded that: Several roof tiles were observed to have lifted during the storm and are no longer properly secured to the roof deck; it is evident that the concrete tile roof system for the subject building show signs of hurricane-related damages; the hurricane damage is largely evident through broken tiles and loose/uplifted tiles; when the tiles uplifted, the fasteners utilized to attach the tiles experienced partial pullout, which results in the seal at the fastener/roof membrane interface to become compromised and allows potential avenues for water intrusion to occur; and the existing roof tiles are no longer manufactured and are no longer available to match the existing roof tiles. *Please find a copy of ButlerMatrix's preliminary report attached hereto as Exhibit A.*

On March 4, 2019, Christopher S. Smith, P.E. of The Vertex Companies, Inc. was contracted by Defendant to create an engineering report regarding the loss reported at the Property.

*Please find a copy of The Vertex Companies, Inc.'s Report attached hereto as Exhibit B*. Among his findings Mr. Smith included a wind field for gust wind speed which he obtained from FEMA. The windspeed map noted that the Property was within the contours indicated sustained wind gusts of 85 miles per hour and 95 miles per hour. *Id.* at page 4. Mr. Smith's report also concluded that "wind-field maps indicated wind speeds within contours of 95 mph…" *Id*. at page 9.

Defendant responded to the reported Loss by assigning claim number 20190122013 (the "Claim") and conducting its own investigation of the reported damage. Following Defendant's or its agent's inspection of the Property, Defendant issued correspondence to the Insureds on April 30, 2019 denying coverage for the Claim, based upon inspections conducted by Connell Contracting, Inc. and The Vertex Companies. *A copy of Defendant's April 30, 2019 correspondence is attached hereto as Exhibit C.* When Defendant failed to make a payment to the Insureds, it breached the Policy by failing to fully pay for a covered loss as required under the terms and conditions of the Policy more thoroughly discussed below.

In preparation for Joe Butler, P.E.'s deposition in this litigation, Mr. Butler conducted an onsite visit to confirm his initial findings.[1] Butler's secondary report confirmed its earlier findings but also noted missing tiles which were not included in the preliminary report. *Please find a copy of ButlerMatrix's secondary report attached hereto as Exhibit D.* The reasoning for this is that the area of the roof with the missing tiles simply was not originally photographed. Additionally, Butler utilized a wooden wedge to document the approximately two (2) inch lift in a number of the tiles at the subject property. The shape of the wedge allows the exact amount of lift to be documented and avoids lifting to a predetermined point or potentially damaging a roof any further than already observed. *See Joseph Butler, P.E.'s Affidavit attached hereto as Exhibit E.* This

---

[1] Defendant canceled the deposition a couple of days before it was scheduled to take place and Defendant never opted to reschedule the deposition.

3

technique is widely used in the field by those inspectors and engineers whom are tasked with inspecting storm-damaged roofs. *Id.* If the tiles are in a condition that they can be lifted by simply overcoming the weight of the tile, then a serious life safety condition exists for those residents that might be in the home during a future storm event since failure of the building envelope can cascade to overall structural failure.

The findings in Butler's secondary report were based upon the application of scientific and technical protocols which are regularly used in the field of engineering. Furthermore, Mr. Butler's approximately thirty (30) years of experience in construction and engineering led to the conclusions that were reached in the secondary report. Butler's report was created to ultimately be used at trial to assist the Jury in making a decision as to whether the damage sustained at the subject property was in fact a result of Hurricane Irma.

II. **MEMORANDUM OF LAW**.

A. **Legal Standard**.

Expert witness testimony is subject to Rule 702 of the Federal Rules of Evidence. *United States v. Clotaire*, 963 F.3d 1288 (11th Cir. 2020). Rule 702 allows a witness to testify as an expert if he is qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. To faithfully discharge its gatekeeping duty, a trial court must engage in a three-part analysis and consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).

Determining whether expert testimony is the product of "reliable principles and methods" is the province of the *Daubert* test. *See City of Tuscaloosa,* 158 F. 3d 548 at 1262. "When evaluating the reliability of scientific expert opinion, the trial judge must assess 'whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue.'" *Id.* at 1261-62.

*Daubert* instructs that a reliability determination involves four main inquiries about the expert's theory or technique: "(1) whether it can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) what its known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether it is generally accepted in the field." *United States v. Brown*, 415 F.3d 1257, 1264 (11th Cir. 2005) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)).

However, it is important to note that Rule 702 is a screening procedure, not an opportunity to substitute the trial court's judgment for that of a jury. *United States v. Barton*, 909 F.3d 1323, 1332 (11th Cir. 2018). In that regard, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence," *Quiet Tech. DC-8 v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003);, and "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," *Id.* (quoting *Daubert*, 509 U.S. at 596). Objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility. *Rosenfeld v. Oceania Cruises*, Inc., 654 F.3d 1190, 1193 (11th Cir. 2011).

It would go beyond the gatekeeping function of the trial court to exclude an expert's testimony on the basis of a credibility determination favoring the opposing party's expert's

5

testimony. *See Ambrosini v. Labarraque*, 101 F.3d 129, 141, 322 U.S. App. D.C. 19 (D.C. Cir. 1996) ("The district court[] err[ed] . . . [by] misconce[iving] of the limited 'gatekeeper' role envisioned in *Daubert*. By attempting to evaluate the credibility of opposing experts and the persuasiveness of competing scientific studies, the district court conflated the questions of the admissibility of expert testimony and the weight appropriately to be accorded such testimony by a fact finder.") (cited approvingly in *Quiet Tech.*, 326 F.3d at 1341).

## JOSEPH BUTLER'S DETERMINATION OF WIND FORCE

Joseph Butler is a well-respected and highly skilled engineer with years of experience, training and recognition. Joseph Butler has over thirty (30) years of progressive engineering and construction experience that include a specialization in roof inspection and certification in Wind Inspection. *See Exhibit E.* Mr. Butler's methodology takes into account knowledge and data provided by *both* experts in the field of wind engineering and meteorologists with the common goal of documenting and analyzing the effects of a hurricane (such as Hurricane Irma) on various structures in parts of Florida in relation to the wind speed maps and design requirements of the Florida Building Code. *See Exhibit E*.

This method of wind engineering combines meteorological data from multiple local sources to produce a general wind speed contour map. *See Exhibit E*. Such a map is used by engineers and the Florida Building Code in the design of new structures. *See Exhibit E.* This process provided the best way to combine scientific theory and metrological data with actual damages that occurred. Information gathered from this method is further investigated over the course of several months in order to produce an extensive final report. This methodology is not only well recognized in the field of engineering but sponsored by the Florida Building Commission. *See Exhibit E*.

Defendant filed this Motion for to Strike without attempting to obtain necessary information from Plaintiff's expert. Defendant's Motion to Strike is misleading, as it emphasizes only the primary stages of Mr. Butler's methodology without providing the full report itself. Had Defendant chosen to depose Mr. Butler and question him about his reports then Mr. Butler would have detailed the scientific basis for the wind map discussed above. Additionally, Mr. Butler would have noted that the Insureds home is located between in the contour map in between areas that experienced wind gusts exceeded 80 Miles Per Hour and 90 Miles Per Hour.

According to Mr. Butler, "the detached, damaged and displaced concrete tiles observed are consistent with windborne debris strikes and uplift pressures created by high wind loading," and "excess moisture in the sheathing and primary moisture barrier located downgradient of the storm-induced openings in the roof covering and areas of sheathing with excess moisture must be replaced." "Statements made by the insured to SFR Services and a review of historical NOAA weather data support the opinion that Hurricane Irma between September 9, 2017, and September 11, 2017, to a reasonable degree of engineering certainty, is the storm event that caused the damage observed at the subject property." *See Exhibit D*. All of Mr. Butler's conclusions are evident of damage caused by hurricane-style winds.

Defendant incorrectly attempts to discredit Butler's testimony as it relates to windspeed by rebutting it with the testimony of a competing witness who employed the same general methodology. *See Barton*, 909 F.3d 1323 at 1333. In *Barton*, the defendant attempted to disqualify an expert witness based upon the "reliable methodology" prong of *Daubert*. *Id.* at 1331. At issue in Barton was competing expert witnesses' interpretations of DNA evidence. The Eleventh Circuit agreed with Florida's Middle District that the arguments made by the defendant did not undermine admissibility under *Daubert*, but rather went to the weight of the evidence and could be presented

to the jury at trial. *Id.* at 1333-1334.  The basis for this opinion was a finding by both courts that the competing witnesses relied on the same general methodology and that it would have gone beyond the gatekeeping function of the trial court to exclude one expert's testimony on the basis of a credibility determination favoring the other expert's testimony.

Objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.  *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011).  Defendant's Experts that created reports that detail the estimated wind speeds at the Property used the same general information that was used by Mr. Butler.  One of Defendant's Experts even concluded that the property was situated in a wind speed map showing maximum wind gusts exceeding 90 mph.

The argument being made to exclude Mr. Butler's determination of wind force is almost identical to the argument examined by the Court in *Barton*.  The wind contour map which Mr. Butler relies upon in his Report utilizes information which is compiled from buoys and automated surface observing systems in a given area which is then computed to form the map. *See Exhibit C page 3*.  Mr. Butler then combined that information which was compiled and analyzed it in conjunction with the Insureds' statements and field tests and observations to determine that the home sustained hurricane force winds.

Defendant's competing expert James V. Bria III, C.C.M., created a wind speed report which relied upon automated surface observing systems in the area and general information from the National Hurricane Center.  *See Bria's full report attached hereto as Exhibit F*.  Mr. Bria's report notes that the two automated surface observing systems relied upon to create the estimated wind speeds at the Property are located at Charlotte County Airport (noted as KPGD) and Venice Municipal Airport (noted as KVNC).  *Id.* at page 5.  Mr. Bria's report estimates that the "peak

8

wind gusts" at the Property were 74 miles per hour with a margin of error +/- 7 miles per hour. *Id.* at page 4.

Defendant's attempt to use Mr. Bria's testimony, that is based upon the same general methodology that was used by Mr. Butler, regarding the wind speed sustained at the Property to attempt to strike Mr. Butler's testimony is improper. Furthermore, Defendant's engineering expert Christopher Smith also used wind-field maps to conclude that the Property was within a contour of 95mph. *See Exhibit B*. The fact that the wind-speed numbers found in the conclusions of two of Defendant's expert reports (when applying the possible margin of error to Mr. Bria's report) correlate with Mr. Butler's numbers is a fact that should be left to the jury to evaluate. *See Barton*, 909 F.3d 1323 at 1333.

## **MR. BUTLER'S ANALYSIS OF DIRECT PHYSICAL LOSS**

Defendant's Insurance Policy provides coverage for a direct physical loss to the property. *Please find a copy of the subject Insurance Policy attached hereto as Exhibit G*. Defendant's Policy does not provide for any exclusions for windstorm damage to the property. Thus, windstorm damage to the property is a covered direct physical loss. In an attempt to avoid coverage, Defendant alleges that the damages to the property were caused by "wear and rear, marring, deterioration damage," as well as "faulty, inadequate or defective . . . [d]esign, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction; . . . or [m]aintenance," which has allowed Defendant to deny Plaintiff's claim of loss outright.

Defendant argues that the credibility and reputation of Mr. Butler's expert opinions and report, should deem him an unfit expert witness. Plaintiff has demonstrated that Mr. Butler is more than qualified to testify as an expert because: (1) he meets the criteria as outlined under the *Daubert*

9

standard, and (2) his methodology is scientifically proscribed and wholly accepted within his area of practice and expertise.

First, Plaintiff has debunked any speculation of Mr. Butler's qualifications as prescribed under *Daubert*. As Defendant has provided in both its Motion for Summary Judgment and Motion to Strike/Limit Plaintiff's Expert's Testimony, the Eleventh Circuit takes under consideration a three-part analysis for determining whether expert testimony is admissible under *Daubert* and Rule 702. Courts must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Seamon v. Remington Arms Co., LLC (In re Estate of Seamon)*, 813 F.3d 988, 990 (11th Cir. 2016). When discussing the second *Daubert* prong, the Eleventh Circuit identified several factors that it may take into consideration when determining "reliability." Such factors include: (1) whether the expert's methodology can be tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method has a known rate of error; (4) whether the technique is generally accepted by the scientific community. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291–92 (11th Cir. 2005); *See also Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341.

However, the Eleventh Circuit has made it very clear that this list of factors "do[es] not exhaust the universe of considerations that may bear on . . . reliability." *Id*. The qualification standard for expert testimony is "not stringent," and "so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009). While the inquiry is "a flexible one," the focus "**must be solely on principles and**

10

**methodology, not on the conclusions that they generate**." *Daubert*, 509 U.S. at 594-95, 113 S. Ct. at 2797 (emphasis added); *see McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) (recognizing a trial judge "should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate").

As previously clarified, Mr.Butler has implemented well-known and recognized methodology that is even sponsored by the Florida Building Commission. Through Defendant's own lack of discovery, Defendant has overlooked the crucial detail that their entire Motion to Strike is based solely on Mr. Butler's primary inspection(s). As such, it would be unfair to judge Mr. Butler's expertise through such a narrow lens. Plaintiff again asserts that Joseph Butler has over thirty (30) years of engineering and construction experience that include a specialization in roof inspection and certification in Wind Inspection. Mr. Butler's methodology is made up of multiple components that scientifically provide the basis for ascertaining actual damage, such as a direct physical loss caused by winds.

Second, in his inspection(s) of the Property, Mr. Butler utilized widely used and specific methodology to determine "lifting" on the storm-damaged roof. This method determines the exact amount of lift that needs to be documented, allowing for the collection of photographic evidence to be taken. It is necessary for an experienced engineer like Mr. Butler to document the lifting on roofs that have been exposed to extreme winds in order to mitigate future safety threats to the homeowners. Defendant cannot provide an efficient basis to attack Joseph Butler's expert testimony because Defendant is relying on credibility and not standards set forth in *Daubert*. As such, the court cannot strike Mr. Butler and his opinion.

## CONCLUSION

Plaintiff's Expert Joseph Butler, P.E. is a qualified Expert under *Daubert* and as such should have his report considered by a jury at trial.  For the reasons detailed above, Plaintiff respectfully requests that this Court deny Defendant's Motion to Strike/Limit Plaintiff's Expert Joseph Butler's Testimony.

DATED this 24th day of July 2020.

## CERIFICATE OF SERVICE

**WE HEREBY CERTIFY** that on the 24th day of July 2020, the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

THE WHISLER LAW FIRM, P.A.
<u>Attorneys for Plaintiff</u>
1909 Tyler ST Ste. 501
Hollywood, Florida 33020
Telephone:   (561) 708-0513
E-Mail: service@whislerlawfirm.com

By:   /s/ Joshua Whisler
        JOSHUA WHISLER, ESQ.
        FL Bar No. 98172

**SERVICE LIST**
Jonathan B. Aronson, Esq.
Florida Bar No. 434116
ARONSON LAW FIRM
95 Merrick Way
Suite 720
Miami, FL 33134
Email: jaronson@aronsonlawfirm.com