UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SFR SERVICES LLC, a/a/o
KEITH AND PHYLLIS TUMULTY,

     Plaintiff,

v.                                      Case No. 8:19-cv-2013-CPT

ELECTRIC INSURANCE COMPANY,

     Defendant.
_____/

**O R D E R**

     Before the Court are (1) the *Defendant's Motion for Summary Judgment* (Doc. 27); (2) the *Defendant's Motion to Strike/Limit Plaintiff's Expert Joseph Butler's Testimony* (Doc. 28); and (3) the *Defendant's Motion to Strike Affidavit of Plaintiff's Expert, Joseph Butler* (Doc. 35). For the reasons set forth below, the Defendant's motions are denied.

I.

     This action stems from an insurance coverage dispute involving a homeowner's policy Defendant Electric Insurance Company (EIC) issued to Keith and Phyllis Tumulty for the protection of their residence near Florida's coastline. (Doc. 33-8). Between September 9 and September 11, 2017, a significant storm—known as

Hurricane Irma—passed over the western portion of Florida, including the area in and around the Tumultys' dwelling.  (Doc. 28-4 at 10).

Roughly sixteen months later, in January 2019, the Tumultys retained Plaintiff SFR Services LLC (SFR) to investigate their tile roof, believing that it had suffered damage from Hurricane Irma.  (Doc. 33-1).  As part of their agreement with SFR, the Tumultys assigned to SFR the rights to any insurance benefits that EIC might pay in connection with SFR's repair work.  *Id.*  Concurrently, the Tumultys also submitted a notice of claim with EIC.  (Doc. 27-2 at 2).

SFR tasked one of its sales personnel, Patrick Kinney, with evaluating the Tumultys' residence and, based on that assessment, SFR informed EIC that the Tumultys' entire roof would need to be replaced at a total cost of $139,849.80.  (Doc. 27-4).[1]  In response to this claim, EIC hired Dan Connell to conduct an on-site inspection of the Tumultys' home and to prepare a written account of the damage Connell observed.  (Doc. 27-2 at 3).  Connell subsequently reported to EIC that he found no evidence of any wind damage and that any issues with the roof were the result of ordinary wear-and-tear.  *Id.*  EIC thereafter relayed this report to the Tumultys and SFR.  (Doc. 27 at 7).

The following month, SFR provided EIC with a Forensic Engineering Report prepared by Joseph Butler of ButlerMatrix, LLC, which was predicated upon Butler's

---

[1] SFR would later revise its estimate to $109,553.14.  (Doc. 27-5).

2

review of photographic evidence Kinney obtained during his initial evaluation of the Tumultys' roof.  (Doc. 27 at 7; Doc. 34-1).  In his report, Butler opined, in pertinent part, that (1) multiple tiles on the Tumultys' roof were "displaced," "detached," "cracked," or otherwise "damaged" and were consistent with, *inter alia*, "windborne debris strikes" and/or "uplift pressures created by high wind loading;" (2) certain weather data evidenced that the Tumultys' property was subjected to "wind gusts [of] more than [ninety miles per hour]" upon Hurricane Irma's passing; (3) "[w]ind gusts of this magnitude were significant causal factors associated with the observed damage to the [Tumultys'] roof system;" and (4) statements made by the Tumultys that Hurricane Irma had damaged their home, along with a review of historical National Oceanic and Atmospheric Administration (NOAA) "weather data support[ed] the opinion that Hurricane Irma [was] the storm event that caused the damage observed at the [Tumultys'] property."  (Doc. 34-1 at 3, 10, 19).  Butler included with his report a "[three]-sec[ond] wind speed contour [m]ap" covering Florida for the time period of the "Hurricane Irma Storm Event," as well as several photos depicting "representative damage" to the Tumultys' roof.  *Id.* at 3–6.

After receiving Butler's report, EIC retained Christopher Smith of The Vertex Companies, Inc., to perform a second on-site inspection of the Tumultys' home and to prepare a statement of his findings.  (Doc. 27 at 7).  Smith subsequently issued a report in late March 2019, in which he determined that, consistent with Connell's assessment, the damage to the tiles on the Tumultys' roof was not caused by either a

3

storm or wind.  (Doc. 27-7 at 7).  Smith concluded that the issues with their tile roof were instead partly due to "cyclical thermal expansion and contraction of the tiles and damage from foot traffic which occurred likely during routine access and maintenance of the roof."  *Id.* at 9.  Smith also found that the tile damage was consistent with "age, deterioration, and wear/tear of the materials used to adhere/attach the tiles to the roof."  *Id.*  Smith included with his report a Hurricane Irma "gust wind field" map that he obtained from the Federal Emergency Management Agency, which, in turn, was derived from NOAA data.  *Id.* at 20.

Roughly a month later, in April 2019, EIC denied the Tumultys' claim and notified SFR of the same.  (Doc. 27-8).  In a letter explaining its denial, EIC noted that the Tumultys' homeowner's policy did not cover losses stemming from ordinary wear-and-tear and that, based primarily on Smith's report, EIC had determined the tile damage on the Tumultys' roof was attributable to this cause, rather than Hurricane Irma.  *Id.*

SFR thereafter initiated this action in state court, asserting that EIC breached the Tumultys' policy by failing to pay for SFR's proposed repairs to the Tumultys' roof.  (Doc. 1 at 6–9).  EIC subsequently removed the matter to this Court based on the Court's diversity jurisdiction.  *Id.* at 1–5.  Following removal, the Court entered a Case Management and Scheduling Order (CMSO), which required that SFR and EIC "complete" and "serve" their expert disclosures by April 10, 2020, and April 24, 2020,

respectively; that the parties finish their discovery by June 3, 2020; and that dispositive and expert-related motions be filed by no later than July 6, 2020.  (Doc. 15).

On April 1, 2020, Butler conducted an in-person inspection of the Tumultys' residence and produced an updated Forensic Engineering Report six days later, which SFR disclosed to EIC.  (Doc. 34-4).[2]  While Butler's revised report largely mirrored his original account (including referencing the same three-second wind speed contour map and the NOAA data), it contained, *inter alia*, additional pictures of the tile damage (reflecting missing tiles not depicted in his earlier report); a revised estimate that the winds gusts at the time of the damage were "more than [eighty miles per hour]" (not ninety miles per hour, as he had previously opined); and the results of Butler's repair-related testing and analysis of the detached tiles, which he predicated, in part, on the Florida Building Code Testing Application Standard (TAS) 102-95.  *Id*.

EIC's instant motions for summary judgment and to strike Butler's expert testimony pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (*Daubert*) soon followed.  (Docs. 27, 28).  SFR has responded in opposition to EIC's motions (Docs. 33, 34) and has offered, among other documents, a supplemental affidavit from Butler, in which he tenders additional information regarding his two earlier reports (Doc. 34-5).  In particular, Butler's affidavit sets forth (1) the steps he

---

[2] According to SFR, Butler undertook this visit to confirm his initial findings in anticipation of his then-scheduled deposition.  (Doc. 34 at 3).  SFR further asserts, however, that EIC cancelled the deposition shortly before it was to occur and never rescheduled it.  *Id*. at n.1.

took in performing his April 2020 in-person inspection of the Tumultys' roof; (2) the origin of the three-second wind speed contour map reproduced in both of his reports; (3) his opinion that newly-constructed roofs are less likely to falter in hurricane winds than older roofs because of recent, more stringent design standards; and (4) his reliance on Florida Building Code TAS 102-95 in documenting that the Tumultys' roof tiles exceeded two inches in a "hand-lift" examination, indicating the tiles would not survive high wind speeds in future storm events. *Id.* EIC moves to strike Butler's affidavit (Doc. 35), and SFR opposes that request (Doc. 40). These matters are now ripe for the Court's resolution.

## II.

### A.

The Court commences its analysis with EIC's motion to strike Butler's recent affidavit. In support of that motion, EIC argues that Butler's affidavit "is nothing more than [an] improper and untimely means of supplementing [his earlier] expert reports" in violation of Federal Rule of Civil Procedure 26 and the Court's CMSO, and is thus subject to exclusion under Federal Rule of Civil Procedure 37. (Doc. 35). SFR counters that Butler's affidavit does not contain any new information and, even if it does, it should not be struck because SFR's failure to disclose that evidence in a timely manner was substantially justified and/or harmless. (Doc. 40). After careful review, the Court finds that SFR has the better argument.

6

As part of the discovery process, Rule 26 requires litigants to share certain information regarding their expert witnesses.  *See Prieto v. Malgor*, 361 F.3d 1313, 1317 (11th Cir. 2004) (citing Fed. R. Civ. P. 26(a)(2)(B)).  The purpose of such expert disclosures is "to provide opposing parties [a] reasonable opportunity to prepare for effective cross[-]examination and [to] arrange for expert testimony from other witnesses."  *Reese v. Herbert*, 527 F.3d 1253, 1265 (11th Cir. 2008) (internal quotation marks and citation omitted).

Under Rule 26(a)(2), the scope of a party's expert disclosure turns on whether the expert witness is one who is "retained or specially employed to provide expert testimony . . . or one whose duties as [an] employee regularly involve giving testimony."  Fed. R. Civ. P. 26(a)(2)(B); *see also Anderson v. Mascara*, 347 F. Supp. 3d 1163, 1181 (S.D. Fla. 2018).  If an expert witness fits either of these descriptions, Rule 26(a)(2)(B) directs the party to produce a detailed written report regarding the expert's anticipated testimony.  Fed. R. Civ. P. 26(a)(2)(B); *see also In re Disposable Contact Lens Antitrust Litig.*, 329 F.R.D. 336, 382 (M.D. Fla. 2018).  That written report "must contain: (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous [ten] years; (v) a list of all other cases in which, during the previous [four] years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation

7

to be paid for the study and testimony in the case." Fed. R. Civ. P. 26(a)(2)(B)(i)–(vi). By contrast, an expert witness who does not fall within the ambit of Rule 26(a)(2)(B) need only disclose (i) "the subject matter on which [he is] expected to [testify]," and (ii) "a summary of the facts and opinions to which [he is] expected to testify." Fed. R. Civ. P. 26(a)(2)(C); *see also Arch Specialty Ins. Co. v. BP Inv. Ptrs., LLC*, 2020 WL 5848317, at *4 (M.D. Fla. Oct. 1, 2020) (citations omitted).

Regardless of whether an expert witness is covered by Rule 26(a)(2)(B) or (a)(2)(C), a party is obligated under Rule 26(e) to supplement an expert report "'in a timely manner if the party learns that in some material respect the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.'" *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 718 (11th Cir. 2019) (quoting Fed. R. Civ. P. 26(e)(1)(A)). Such supplementation may not be used, however, to "include[ ] a new theory or opinion," *Brincku v. Nat'l Gypsum Co.*, 2012 WL 1712620, at *2 (M.D. Fla. May 15, 2012) (collecting cases), or to remedy "an inadequate or incomplete preparation,'" *Martin v. Omni Hotels Mgmt. Corp.*, 2017 WL 2928154, at *2 (M.D. Fla. Apr. 19, 2017) (quoting *Companhia Energetica Potiguar v. Caterpillar Inc.*, 2016 WL 3102225, at *6 (S.D. Fla. June 2, 2016)).

That said, an expert "need not stand mute" in response to an opposing party's efforts to exclude his testimony by way of a *Daubert* motion. *Allgood v. Gen. Motors Corp.*, 2006 WL 2669337, at *5 (S.D. Ind. Sept. 18, 2006). As one court has observed,

to hold otherwise would render expert witness practice "even more expensive and unwieldy" because it would force an expert "to anticipate and rebut every possible criticism" in advance.  *Id.*

The extent to which an expert's supplement is deemed "timely" under Rule 26(e) is generally tied to the discovery and expert disclosure deadlines set forth in a court's scheduling order, *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 246224, at *3 (N.D. Fla. Jan. 25, 2021), although—absent a directive from the court to the contrary—Rule 26(e) permits Rule 26(a)(2)(B) expert witnesses to supplement their disclosures up until the pretrial disclosure deadline, Fed. R. Civ. P. 26(e)(2); *see also Mobile Shelter Sys. USA, Inc. v. Grate Pallet Sols., LLC*, 845 F. Supp. 2d 1241, 1250 (M.D. Fla. 2012).  An expert's supplemental report that is disclosed in an untimely manner is subject to exclusion under Rule 37(c).  *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1252 (11th Cir. 2007) ("We have held that a supplemental expert report may be excluded pursuant to [Rule 37(c)] if a party fails to file it prior to the deadline imposed.") (citation omitted).

Rule 37(c) allows for an exception, however, if the proponent of the supplemental expert report can show that its failure to abide by the established deadline "was substantially justified or harmless."  *Lanzi v. Yamaha Motor Corp.*, 2019 WL 9553066, at *5 (M.D. Fla. Sept. 26, 2019) (citing Fed. R. Civ. P. 37(c)(1)).  The party seeking to avoid exclusion bears the burden of demonstrating that it falls within this exception.  *Tech Data Corp. v. Au Optronics Corp.*, 2015 WL 12843886, at *5 (M.D.

9

Fla. Oct. 22, 2015) (citation omitted).   In the end, courts have broad discretion is deciding whether to exclude evidence under Rule 37.   *Guevara*, 920 F.3d at 718; *Taylor v. Mentor Worldwide LLC*, 940 F.3d 582, 593 (11th Cir. 2019) (explaining that a district court abuses its discretion under Rule 37 only when it "relies on a clearly erroneous finding of fact or an errant conclusion of law, or improperly applies the law to the facts") (citing *Adams v. Austal U.S.A., LLC*, 754 F.3d 1240, 1248 (11th Cir. 2014)).

In this case, EIC contends that Butler's affidavit was filed after the Court's expert disclosure deadline (as well as the Court's discovery deadline) and is therefore subject to exclusion under Rule 37(c).   (Doc. 35 at 6).   The timeliness analysis, however, is not as simple as EIC suggests.   Although neither EIC nor SFR reference the issue, it appears that Butler has been retained to provide expert testimony and is thus covered by Rule 26(a)(2)(B).   And, as noted above, Rule 26(e) allows Rule 26(a)(2)(B) expert witnesses to supplement their disclosures up until the pretrial disclosure deadline, Fed. R. Civ. P. 26(e)(2), which—unless the Court orders otherwise—is no later than thirty days before trial, Fed. R. Civ. P. 26(a)(3).   The Court's CMSO in this case does not explicitly address whether it modifies the default deadline established under Rule 26(a)(3), and the parties do not discuss the matter in their filings.

The Court need not resolve this question, however, because even assuming that Butler's affidavit amounted to a supplementation of his earlier reports under Rule 26(e) and even assuming that supplementation was untimely, SFR's failure to disclose this

10

sworn statement before EIC filed its instant motions was substantially justified and/or harmless given the particular circumstances here.

"In general, excluding expert testimony is viewed as a 'drastic' sanction requiring careful consideration." *Bendik v. USAA Cas. Ins. Co.*, 2019 WL 9466018, at *2 (M.D. Fla. Oct. 25, 2019) (citing *United States v. McCarthy Improvement Co.*, 2017 WL 443486, at *6 (M.D. Fla. Feb. 1, 2017)); *see also* Fed. R. Civ. P. 37, advisory committee's note to 1993 amendment (recognizing that "harmlessness" and "substantial justification" tests are "needed to avoid unduly harsh penalties," such as exclusion of evidence). As a result, courts in this District weigh the following five factors to determine whether a failure to disclose evidence is substantially justified or harmless: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence." *Bendik*, 2019 WL 9466018, at *2 (collecting cases).

In this case, all five of the above factors militate against the "drastic" remedy of exclusion. *Id.* To begin, it is difficult for EIC to argue that it has been caught "off-guard" or "ambush[ed]" by Butler's affidavit, insofar as the affidavit does not provide any "new theories" by Butler and instead includes information that one would fairly

expect SFR to elicit from Butler at trial.[3]  *Tennant v. Handi-House Mfg. Co.*, 2018 WL 8248898, at *3 (M.D. Fla. July 26, 2018) (rejecting argument that defendant's delayed disclosure of expert opinion amounted to "trial by ambush"); *Savoy v. Fed. Exp. Corp. Long Term Disability Plan*, 2010 WL 3038721, at *5 (D. Md. July 30, 2010) (rejecting similar argument that plaintiff was caught "off guard" by dilatory disclosure).  Indeed, EIC's own experts were able to critique and formulate responses to Butler's anticipated testimony—as reflected in Butler's earlier reports—without referring to his affidavit. Notably, EIC does not identify in its motion to strike any specific, previously-undisclosed material that would suggest Butler's affidavit supplies a critical link which was missing from his earlier submissions.

Even if EIC could validly claim that the substance of Butler's affidavit came as a surprise to it, any such surprise can be cured at this juncture by reopening discovery solely with respect to Butler's testimony.  *See Engle v. Taco Bell of Am., Inc.*, 2011 WL 883639, at *2 (M.D. Fla. Mar. 14, 2011) ("The reopening of discovery cures any prejudice that the [plaintiff] may have sustained due to untimely disclosures."); *Pitts v. HP Pelzer Auto. Sys., Inc.*, 331 F.R.D. 688, 697 (S.D. Ga. 2019) (explaining that reopening discovery best fits the substantive harm caused by an opposing party's

---

[3] By way of example, Butler's exposition in his affidavit regarding Florida Building Code TAS 102-95, the photographs of his inspection, and the three-second wind speed contour map are topics addressed in his earlier reports that SFR might be inclined to expand upon during its direct examination of Butler, and/or that EIC, itself, might attempt to draw out in its cross-examination of Butler.

failure to timely reveal discovery materials) (citations omitted).  To this end, the Court will allow EIC—if it wishes—to take an out-of-time deposition of Butler.

In addition to the above reasons, denying exclusion of Butler's affidavit would not disrupt the trial, which is still several months away.  *OFS Fitel, LLC v. Epstein, Becker & Green, P.C.*, 549 F.3d 1344, 1364 (11th Cir. 2008) (finding that, because "no trial date for the case had been set or was imminent," the movant could not complain that delayed disclosure harmed its ability to prepare for trial).  More importantly, Butler appears to be SFR's only expert witness, which makes any supplemental analysis contained in his affidavit significant to SFR's presentation of its case.  *Pitts*, 331 F.R.D. at 697 ("As often stated in the Eleventh Circuit, courts 'have a strong preference for deciding cases on the merits.'") (quoting *Perez v. Wells Fargo, N.A.*, 774 F.3d 1329, 1332 (11th Cir. 2014)).

And, lastly, there is some merit to the contention that Butler's allegedly dilatory disclosure was aimed at refuting EIC's *Daubert* challenge to the admissibility of his expert testimony.  As previously referenced in this regard, expert witnesses like Butler cannot be expected to "anticipate and rebut every possible criticism" of their reports and they "need not stand mute in response to" a *Daubert* motion.  *Allgood*, 2006 WL 2669337, at *5.

In sum, even assuming Butler's affidavit constitutes a supplementation of his earlier reports under Rule 26(e) and even assuming such supplementation was untimely, the Court finds that this belated disclosure is substantially justified and/or

13

harmless given the record before it.  As a result, the Court declines to exercise its broad discretion by imposing the "drastic sanction" of excluding Butler's affidavit.

### B.

Turning to EIC's *Daubert* motion, the gist of that motion is that Butler's expert opinions should be stricken because they are unreliable and will only serve to confuse and mislead the trier of fact.  (Doc. 28).  SFR counters that Butler's expert testimony satisfies *Daubert*'s strictures and that SFR should therefore be allowed to present that testimony to the jury.  (Doc. 33).  To resolve the parties' quarrel, the Court starts with the legal principles governing expert testimony.

Federal Rule of Evidence 702, as informed by *Daubert* and its progeny, establishes the parameters for the admissibility of expert testimony.  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005); *United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir. 2004).  Rule 702 provides that, where "scientific, technical, or other specialized knowledge will assist a trier of fact to understand the evidence or determine a fact in issue," a witness "qualified . . . by knowledge, skill, experience, training or education, may testify in the form of opinion" if (1) "the testimony is based upon sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) the witness "has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  The party offering expert testimony bears the burden of showing by a preponderance of the evidence that each of these requirements has been met.  *Rink,* 400 F.3d at 1292; *Frazier,* 387 F.3d at 1260.

14

By its terms, Rule 702 compels trial courts to serve essentially "as 'gatekeepers' to ensure that speculative, unreliable expert testimony does not reach the jury." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (citing *Daubert*, 509 U.S. at 597, n.13). To carry out this function, trial courts must engage in a three-step analysis:

> First, the expert must be qualified to testify competently regarding the matter he or she intends to address. Second, the methodology used must be reliable as determined by the *Daubert* inquiry. Third, the testimony must assist the trier of fact through the application of expertise to understand the evidence or determine a fact in issue.

*Id.* (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). While these inquiries overlap to some degree, each involves "distinct concepts that [trial] courts and litigants must take care not to conflate." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

Trial courts are accorded "broad discretion" and "wide latitude" in applying these three factors and the Eleventh Circuit has made clear that it will "defer to a district court's evidentiary rulings [on such matters] to a considerable extent." *Kilpatrick*, 613 F.3d at 1343 (citation omitted). That said, courts must remain mindful that it is not their role under *Daubert* "to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech.*, 326 F.3d at 1341. Indeed, the Eleventh Circuit has cautioned that the *Daubert* inquiry is not intended to "supplant the adversary system." *Id*. Instead, as the Supreme Court itself observed in *Daubert*,

15

"[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof [remain] the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596.

With the above principles in mind, the Court begins its *Daubert* analysis with the qualifications prong.  To satisfy this requirement, a party must show that its expert has sufficient "knowledge, skill, experience, training, or education" to form a reliable opinion about an issue before the Court.  *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1193 (11th Cir. 2010) (quoting Fed. R. Evid. 702).  This standard is "not [a] stringent" one and is met as "long as the witness is at least minimally qualified." *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 585 (N.D. Fla. 2009) (citations omitted). Once the proponent of the expert testimony crosses this threshold, any objections to the expert's qualifications will be deemed to go to the credibility and weight of the expert's testimony, not its admissibility.  *Secs. & Exch. Comm'n v. Spartan Secs. Grp., Ltd.*, 2020 WL 7024884, at *3 (M.D. Fla. Nov. 30, 2020) (citation omitted).  A district court's determination of an expert's qualifications rests within its sound discretion. *Berdeaux v. Gable Alden Life Ins. Co.*, 528 F.2d 987, 990 (5th Cir. 1976).[4]

According to the materials before the Court, Butler is a Florida-licensed professional engineer, who holds a Bachelor of Science degree in civil engineering

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit issued before the close of business on September 30, 1981.

from Purdue University.  (Doc. 34-5 at 8).  He is also a Florida-licensed commercial building contractor, as well as a certified roof inspector, and has completed the Tile Roofing Institute's High Wind Manual Certification Program.  *Id.*  During the course of his career, Butler has utilized his skills in a variety of engineering and project management-related capacities and—since 2016—has served as the president of the project management and forensic engineering firm, ButlerMatrix, LLC.  *Id.* at 8.  While heading ButlerMatrix, Butler has completed more than one thousand forensic engineering reports for residential and commercial properties in Florida and has conducted "many roof investigations since Hurricane Irma."  *Id.* at 4–5, 8.

Upon a thorough review of Butler's submissions, the Court finds that SFR has met its burden of showing that Butler is at least "minimally" qualified to opine on the issues in this case, including the cause of the damage to the Tumultys' residence.  As outlined above, Butler appears to possess an appropriate educational and professional background in engineering, construction, and roof inspections to serve as an expert regarding such matters.  *See First United Pentecostal Church v. GuideOne Specialty Mut. Ins. Co.*, 189 F. App'x 852, 856–57 (11th Cir. 2006) (per curiam) (affirming lower court's decision to admit engineering expert's testimony on roof damage causation where witness's expertise was based on experience) (citing *Mich. Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir. 1998));[5] *Riverside Apts. of Cocoa, LLC v.*

---

[5] Unpublished opinions are not considered binding precedent but may be cited as persuasive authority. 11th Cir. R. 36-2.

*Landmark Am. Ins. Co.*, 2020 WL 8184711, at *3 (M.D. Fla. Dec. 4, 2020) (finding "forensic engineer['s]" training and experience provided a sufficient foundation for his testimony on identifying the cause of storm-related damage).

EIC's arguments attacking Butler's qualifications are unavailing.  Contrary to EIC's contentions, SFR is not seeking to tender Butler as an expert in "forensic meteorology." (Doc. 28 at 12).  Instead, as outlined above, Butler's opinions as to the wind speeds to which the Tumultys' roof was exposed during Hurricane Irma are predicated upon an existing wind-speed map that includes the location of the Tumultys' residence.  (Doc. 34-4 at 3; Doc. 34-5 at 4–5).  Apart from sweeping citations to cases that reject speculative testimony, EIC has not directed the Court's attention to any binding authority that would prohibit Butler from relying on such weather data to reach his conclusion on the issue of causation.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (recognizing that "[t]rained experts commonly extrapolate from existing data"); *Clena Invs., Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 662 (S.D. Fla. 2012) (explaining that an expert engineer "need not be able to predict a hurricane to be able to identify the damages that result from one").  As discussed further below, EIC's criticisms of Butler's use of a wind-speed map— something Smith also did in his assessment—go to the credibility of Butler's opinion, rather than his qualifications to render it.  *Clena Invs.*, 280 F.R.D. at 662 (noting that defendant's retention of expert with professional engineering credentials equal to

18

plaintiff's expert presumably reflects defendant's judgment on experts' qualifications for assessing alleged wind damage).

As for the second prong pertaining to the reliability of an expert's opinion, the Supreme Court in *Daubert* identified the following "four nonexclusive factors" for trial courts to employ in addressing this area of inquiry: "(1) whether the theory can and has been tested; (2) whether it has been subjected to peer review; (3) the known or expected rate of error; and (4) whether the theory and methodology employed is generally accepted in the relevant scientific community." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1251 (11th Cir. 2005) (citing *Daubert,* 509 U.S. at 593–94). As *Daubert* and its progeny make clear, however, these factors are only general guidelines, and trial courts have "'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" *United States v. Kyler*, 429 F. App'x 828, 830 (11th Cir. 2011) (per curiam) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

In fact, the Eleventh Circuit has observed that not all of these factors will apply in every case, with some cases even emphasizing the importance of other, unstated factors. *Frazier*, 387 F.3d at 1261–62 (citations omitted). To this end, courts in this District have extrapolated from *Daubert* and considered, *inter alia*: (1) whether the expert's field is governed by recognized standards and, if so, whether the expert adhered to those standards; (2) whether the expert accounts for alternative or conflicting information; and (3) whether, in conducting his analysis, the expert applied

19

the same standard of care that a similar expert in that field would apply in a non-litigation context. *Woienski v. United Airlines, Inc.*, 383 F. Supp. 3d 1342, 1348 n.4 (M.D. Fla. 2019) (citations omitted).

With respect to non-scientific, experience-based testimony like that at issue here, trial courts enjoy flexibility in conducting their reliability analysis. *Frazier*, 387 F.3d at 1262; *Rink*, 400 F.3d at 1291 (noting that appellate court will defer to lower court's reliability determination unless it is "manifestly erroneous") (citation omitted). But, even here, trial courts must satisfy themselves that the witness has appropriately explained "how [his] experience leads to the conclusion [he] reached, why that experience [provides] a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (citation omitted). "An expert's unexplained assurance that [his] opinions rest on accepted principles" is insufficient. *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1130 (M.D. Fla. 2007) (citation omitted).

Here, EIC's challenge to Butler's reliability is based on the following arguments: (1) Butler inappropriately relied upon reports from the Tumultys and SFR's salesman, Kinney, as well as the three-second wind speed contour map, in reaching his conclusion on the cause of the damage to the Tumultys' roof; (2) Butler's use of the Florida Building Code TAS 102-95, among other protocols, to measure the displacement in the Tumultys' roof tiles was improper; and (3) Butler failed to explain what impact, if any, the nearly three-year period between Hurricane Irma and the

20

completion of his in-person roof inspection had on his opinions.  (Doc. 28 at 11–14, 15–18).  Employing the more flexible approach that experienced experts such as Butler demand, *Woienski*, 383 F. Supp. 3d at 1348 n.4, the Court finds EIC's contentions unpersuasive.

To address each of EIC's arguments, the Court must first look to Butler's reports and his affidavit to evaluate whether he has provided an appropriate explanation of how he utilized his background and training to conclude that Hurricane Irma damaged the Tumultys' residence.  *Frazier*, 387 F.3d at 1261.  As noted at the outset, Butler claimed that his engineering knowledge, combined with his roofing inspection experience and certifications, permit him to identify and establish the existence of wind-related damage.  (Doc. 34-5 at 5).  In his April 2020 report, Butler noted "displaced," "detached," "cracked," or otherwise "damaged" tiles on the Tumultys' roof, which he associated with "windborne debris strikes" and/or "uplift pressures created by high wind loading."  (Doc. 34-4 at 10).  That report also contains a series of photographs that appear to support the damage-related descriptions he provided, and his affidavit contains a narrative explanation of the stages of his inspection.  *Id.* at 4–10.  Butler also explains in his affidavit that, during his many post-Irma roof inspections, he has found a close correlation between the three-second wind speed contour map and the roof damage to a structure he has spotted, and that as recorded wind speeds in a given area increase, so too has the degree of damage he has observed at such areas.  (Doc. 34-5 at 4–5).

21

EIC's first argument—that Butler inappropriately utilized the Tumultys' statements to the SFR salesman and the three-second wind speed contour map—does not undermine Butler's above-described methodology.  As an initial matter, Federal Rule of Evidence 703 enables experts like Butler to base their conclusions on facts and data supplied by others as long as that information is of the type "regularly relied upon by experts in his field."  *United States v. Winston*, 372 F. App'x 17, 20 (11th Cir. 2010) (per curiam) (quoting *United States v. Steed*, 548 F.3d 961, 975 (11th Cir. 2008)).  Here, EIC's own expert, Smith, acknowledged that an inspecting engineer's use of third-party information is not squarely proscribed in their field, explaining instead that the "preferred practice" is for the engineer to conduct his own investigation.  (Doc. 28-5 at 3).  The principal reason Smith gave for not relying solely on a non-engineer's statements (the potential for a financial conflict of interest), however, essentially goes to the issue of bias, such that the proper method of attacking the credibility of Butler's sources is cross-examination, not exclusion of his opinions altogether.  *Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1332 (11th Cir. 2014) ("Bias in an expert witness's testimony is usually a credibility issue for the jury.") (citations omitted); *Bachmann v. Hartford Fire Ins. Co.*, 323 F. Supp. 3d 1356, 1360 (M.D. Fla. 2018) (explaining that "the Court's limited gatekeeping role 'is not intended to supplant' [the] presentation of contrary evidence to the jury or the practice of cross-examination in a courtroom") (citation omitted).

Moreover, as Butler's reports and affidavit make clear, he did not predicate his opinions only on the Tumultys' claim that their home was damaged by Hurricane Irma.  Rather, he also took into account purportedly-pertinent NOAA data, his own visit to the home, his own roof inspection experience, knowledge, and training, and the three-second wind speed contour map.  (Doc. 34-4 at 3–4, 10, 19; Doc. 34-5 at 3–5).  Rule 703 expressly authorizes experts to rely on information the expert did not personally acquire but later identified through other means, which is precisely what Butler did in this case.  *See In re Disposable Contact Lens*, 329 F.R.D. at 373 (citing Fed. R. Evid. 703; *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) ("[Q]uestions relating to the bases and sources of an expert's opinion affect the weight to be assigned [to] that opinion rather than its admissibility and should be left for the jury's consideration.")).

Notably, EIC does not contest Butler's use of the NOAA data, nor could it, since its own experts relied on similar data in reaching their respective conclusions. (Doc. 28-4 at 3, 10; Doc. 27-7 at 16–21).  Likewise, even though EIC presents several reasons why one might not place great weight on the three-second wind speed contour map—such as the lack of peer-reviewed models and the use of preliminary information—EIC does not dispute Butler's claim that other experts in his field, including the Florida Building Commission, utilize such maps in analyzing the effects of hurricane winds on structural design requirements.  (Doc. 34-5 at 4); *see also Clena Invs.*, 280 F.R.D. at 664 (finding persuasive expert's observation that his method of

associating roof damage with a particular storm was based on his experience ensuring that buildings complied with hurricane-related building codes).

EIC's next argument—that Butler employed an improper standard to assess the damage to the Tumultys' roof—is likewise misplaced.  To begin, it appears that Butler relied on Florida Building Code TAS 102-95 to assess whether the Tumultys' roof tiles could survive a future storm event.  (Doc. 34-5 at 6).  Further, even assuming that Butler relied on this protocol to evaluate whether Hurricane Irma harmed the Tumultys' roof, it was merely one among many other factors—including his own experience conducting post-Irma roof inspections—that he considered in rendering his opinion.  *St. Louis Condo. Ass'n v. Rockhill Ins. Co.*, 2019 WL 2013007, at *4 (S.D. Fla. Mar. 11, 2019) (noting that "an engineer's use of techniques of visual inspection, code review, and reliance on experience and expertise can satisfy the *Daubert* reliability prong.") (citing *Clena Invs.*, 280 F.R.D. at 664); *Travelers Prop. Cas. Co. of Am. v. All-South Subcontractors, Inc.*, 2018 WL 1787884, at *7 (S.D. Ala. Apr. 13, 2018) (recognizing same and gathering authority) (citations omitted).

Regardless of the degree to which Butler's conclusion was informed by applying Florida Building Code TAS 102-95, EIC's contention that he should have applied a testing formula favored by Smith simply indicates a disagreement between experts on the proper standards to employ in inspecting roof damage.  That the field of roof inspection is susceptible to multiple methodologies for identifying and determining the cause of roof damage does not, by itself, lead to the inevitable conclusion that the

24

standard preferred by one of the experts is inherently incorrect.  *See Monroe Cty. Emps.'  Ret. v. S. Co.*, 2019 WL 2482399, at *5 (N.D. Ga. June 12, 2019) (finding fact that different experts approach a question "using different methods, focusing on different elements . . . . [is] more properly explored through cross[-]examination at trial").  Accordingly, if EIC believes Smith's formula is more appropriate for the type of testing Butler conducted, it can explore that issue on cross-examination.  *Bachmann*, 323 F. Supp. 3d at 1360 (noting that, once admitted, reliability disputes may be resolved by testimony from an opposing expert, who can provide "both contrary opinions and criticism of—among other things—the opposing expert's qualifications and the inaccuracy or unreliability of his or her opinions") (citation omitted).

EIC's final argument—that Butler did not explain the impact, if any, of alternative explanations for the damage to the Tumultys' roof during the nearly three-year time period between Hurricane Irma and his latest inspection—similarly fails.  It has long been recognized that absolute certainty is not expected, or required, of experts, *Jones v. Otis Elevator Corp.*, 861 F.2d 655, 662 (11th Cir. 1988) (citation omitted), and that an expert's ability to rule out alternative causes is merely one of many considerations to be assessed in determining the admissibility of the expert's testimony, Fed. R. Evid. 702 advisory committee's note.  Ultimately, the reliability inquiry here is simply whether Butler sufficiently explained how he reached his conclusion, not necessarily whether he reached the "right" conclusion to the exclusion of all others.  *Quiet Tech.*, 326 F.3d at 1346 ("[N]ormally, failure to include variables

will affect the analysis' probativeness, not its admissibility.") (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)).  As with EIC's other challenges, the claim that Butler did not consider alternative causes goes to the weight of his opinion (which is fodder for cross-examination), not its admissibility.  *Riverside Apts.*, 2020 WL 8184711, at *3 (observing that defendant's *Daubert* challenge based on expert's delayed inspection of allegedly-damaged roof undermines opinion's persuasiveness, not its admissibility); *Banta Props., Inc. v. Arch Specialty Ins. Co.*, 2011 WL 13096476, at *4 (S.D. Fla. Dec. 21, 2011) (finding challenges based on an expert's failure to distinguish among alternative causes of roof damage were better addressed on cross-examination).

In sum, each of EIC's challenges identifies potential cracks in the foundation of Butler's opinion but, in the Court's view, they do not create a sufficient reason to exclude his opinion altogether. Thus, for the reasons outlined above, the Court is satisfied that Butler has explained "how [his] experience leads to the conclusion [he] reached, why that experience [provides] a sufficient basis for [his] opinion, and how that experience is reliably applied" to the facts of this case.  *Frazier*, 387 F.3d at 1261 (citation omitted).

The third prong of the *Daubert* analysis regarding helpfulness "goes primarily to [the issue of] relevance."  *Quiet Tech.*, 326 F.2d at 1347 (quoting *Daubert*, 509 U.S. at 591).  To meet this requirement, expert testimony must be probative of an issue in the case and offer insights "beyond the understanding and experience of the average citizen."  *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985) (citations omitted).

26

In this case, Butler's testimony will certainly be probative as to whether the damage to the Tumultys' roof was caused by a storm or strong winds (such as those he associates with Hurricane Irma), as opposed to some other circumstance, like ordinary wear-and-tear, as EIC and its experts maintain.  Butler is a professional engineer with an extensive background in roof inspections and can better identify and diagnose roof damage than the average lay person, who presumably has little such experience.  As a result, Butler's testimony will be helpful to a jury in determining whether the Tumultys' roof was damaged by an occurrence not otherwise excluded from the coverage afforded under their homeowner's policy with EIC. *Quiet Tech.*, 326 F.2d at 1347; *Rouco*, 765 F.2d at 995.

III.

By way of its final motion, EIC asks the Court to award it summary judgment on SFR's breach of contract claim.  Having disposed of EIC's *Daubert* challenge in SFR's favor, the Court has little difficulty in finding that this motion—premised on the absence of Butler's testimony—is without merit.

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1356 (11th Cir. 2007).  A moving party ordinarily discharges its burden by demonstrating that there is an absence of evidence to buttress the non-movant's case. *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001) (citation omitted).

27

When a movant has satisfied its burden, the non-movant must then designate specific facts (by its own affidavits, depositions, answers to interrogatories, or admissions on file) evidencing that there is a disputed question as to a material fact for trial. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citation omitted). To do so, the non-movant must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value.") (citations omitted). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the court may "grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to" such relief. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Welding Servs.*, 509 F.3d at 1356. That is, it must credit the evidence tendered by the non-movant and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted). In doing so, the court does not "weigh conflicting evidence or make credibility determinations" regarding a party or its presentation of the facts. *Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2016) (citations omitted).

As this is a diversity case, the Court is bound by Florida substantive law. *See Auto-Owners Ins. Co. v. Ralph Gage Contracting, Inc.*, 685 F. App'x 820, 821 (11th Cir. 2017) (per curiam) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). In Florida,

an insured may sue for breach of contract when an insurer refuses to honor a claim that the insured alleges is covered by his or her insurance policy.  *Allstate Ins. Co. v. Kaklamanos*, 843 So. 2d 885, 892 (Fla. 2003) (citation omitted).  The elements of a breach of contract claim under Florida law are: (1) a valid contract; (2) a material breach; and (3) damages.  *People's Trust Ins. Co. v. Valentin*, 305 So. 3d 324, 325 (Fla. Dist. Ct. App. 2020) (citation omitted).

There is no dispute here that a valid contract exists.  Where the parties do quarrel, however, is whether EIC materially breached that contract.[6]  Resolution of that issue turns on the terms of the Tumultys' insurance policy, which insures the Tumultys' residence "against direct physical loss to [the] property." (Doc. 33-8).  This includes—as EIC admits in its motion—"hurricane force winds damaging the roof." (Doc. 27 at 13).  EIC argues, however, that—absent Butler's opinions—SFR "has no competent evidence to support that the Tumulty[s'] home suffered a direct physical loss (as required under the [p]olicy) due to hurricane winds[,] as there is no competent evidence to support that the Tumulty[s'] home experienced hurricane force winds," as alleged by SFR.  *Id.* at 17.

EIC's contention is unavailing, primarily because it rests solely on the premise that Butler's opinion is inadmissible.  As the Court has ruled to the contrary, EIC's argument fails.  Indeed, Butler's reports and affidavit create a genuine issue of material

---

[6] The parties also seem destined to contest the third element of damages but do not address that question in their briefing.

fact as to whether the damage to the Tumultys' roof was caused by Hurricane Irma or whether—as EIC claims—it was the result of normal "wear and tear, marring, [and/or] deterioration," or some other policy exception.  *See Progressive Select Ins. Co. v. Rafferty*, 472 F. Supp. 3d 1141, 1145 (M.D. Fla. 2020) ("[W]hen conflicts arise between the facts evidenced by the parties, [the court] credit[s] the nonmoving party's version.") (internal quotation marks and citation omitted).  Because reasonable minds could differ on the inferences to be drawn from the harm to the Tumultys' home and the parties' experts' competing opinions on the matter, the Court finds that summary judgment is not warranted.  *Carlson v. FedEx Ground Package Sys., Inc.*, 787 F.3d 1313, 1318 (11th Cir. 2015) ("[T]he drawing of legitimate inferences from the facts are jury functions, not those of a judge.") (internal quotation marks and citation omitted).

IV.

In light of the foregoing, it is hereby ORDERED:

1.     *Defendant's Motion to Strike Affidavit of Plaintiff's Expert, Joseph Butler* (Doc. 35) is denied.

2.     *Defendant's Motion to Strike/Limit Plaintiff's Expert Joseph Butler's Testimony* (Doc. 28) is denied.

3.     *Defendant's Motion for Summary Judgment* (Doc. 27) is denied.

DONE and ORDERED in Tampa, Florida, this 30th day of March 2021.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

Copies to:
Counsel of record

31